PKOVOSTY, J.
The relator has obtained a writ of quo warranto against the six members -who were added to the sewerage and water board of the city of New Orleans by Act No. Ill of 1902, popularly known as the “Merger Bill,” calling upon them to show by what authority they claim membership in said board. The only interest the relator alleges is the interest which he has in common with all the other resident taxpayers of the city of New Orleans whose property has been assessed for the sewerage and water tax, of the proceeds of which the said board has the administration. He stands upon his rights as a resident and as a taxpayer, and also upon a contract right that has accrued to him, he claims, as a result of the proceedings that culminated in the imposition of the said sewerage and water tax.
The respondents, by way of exception, deny this contract right, and deny that as a citizen, or' as a taxpayer, or as both, the relator has a standing in the case. Further, they deny that the proper parties defendant have been made in the case; and they say that, the sewerage and water board not being a corporation, quo warranto cannot issue against one of its members.
We do not find that there has been any contract entered into between the state and the taxpayers of New Orleans in connection with this tax or the administration of same. These taxpayers devised a scheme for the levy of the tax and the administration of the proceeds thereof, and applied to the Legislature for the requisite legislation to carry the scheme into execution. The Legislature met in extra session, and provided the legislation. This was all. No one asked the Legislature to bind the state to' any contract, or dreamed that it was doing so. No consideration other than such as lies at the bottom of all legislation — that is, the public welfare-moved to the state in the matter, either directly or indirectly. The state was under no obligation in the premises, and it entered into none. It simply legislated.
But, even if the proceedings were fraught with strong elements of contract, still there would be no vinculum juris tying the hands of the state. In the language of the Supreme Court of the United States, “The statute in question is a public law relating to a public subject within the domain of the general legislative power of the state, and involving public rights, and the public welfare of the entire community affected by it.” Newton v. Mahoning Co., 100 U. S. 548, 25 L. Ed. 710. In that case a statute fixed the county seat temporarily at a particular town of the county, and provided that the location should become permanent when the people of the town ■would have contributed 85,000 towards building a courthouse and donated a suitable lot of ground for this purpose. The townspeople donated the lot, and built a courthouse at an expense of 810,000. Some years later the Legislature passed a statute for submitting to a vote of the county the question of changing the county seat. The election resulted favorably to the change, and some of the citizens who had contributed towards the donation of the lot and the construction of the courthouse enjoined the removal. The *843 court “'decided against them, using the language quoted above. This case, and those referred to in the decision, appear to us to negative completely the existence of the relator’s alleged contract rights.
The next exception — that the proper defendants have not been made in the case— was not developed in argument, and we do not see the force of it. The theory of the suit is that the hoard, as constituted by the ■act of 1902, is still intact and unchanged, it being a constitutional board, unchangeable by the Legislature; and that these members attempted to be added to it by the act of 1902 are no part of it, but are intruders upon it. The hoard itself and none of its acts is assailed. The issue is confined to the right of the respondents to claim membership. The membership of those who can claim under the act of 1899 is not questioned. Under these circumstances there was no issue to litigate with these other members or with the board as a hoard, and, as a consequence, neither the board nor any of these other members could be made defendant. The only issue was that with the respondents; and, as a consequence, they alone could be made defendants. The writ of quo warranto, from its very nature, is directed only against the individual whose authority is questioned.
The next exception is not better founded. If the sewerage and water board is not a corporation, then what is it? The Civil Code defines a corporation as follows:
“Ait 427. A corporation is an intellectual body, created by law, composed of individuals united under a common name, the members of which succeed each other, so that the body continues always the same, notwithstanding the change of the individuals who compose it, and which, for certain purposes, is considered as a natural person.”
And it defines a political corporation as follows:
“Art. 429. Corporations are of two principal kinds: political and private. Political corporations are those which have principally for their object the administration of a portion of the state, and to whom a part of the powers of government is delegated to that effect.”
The sewerage and water board answers this description to the very letter. It is an intellectual body, created by law, and composed of individuals united under a common name, who succeed each other, so that the body continues always the same, notwithstanding the change of the individuals who compose it, and which, for certain purposes, is considered as a natural person; and it has principally for its object the administration of part of the powers of government delegated to it for that purpose. Every particular required by the Code for the constitution of a corporation is fulfilled to the very letter. The board is, therefore, a corporation.
What attribute of a corporation is lacking to this board we cannot imagine. By the statute of its creation it is given a name. It is given a domicile, since, from the force of circumstances, its domicile cannot be other than the city of New Orleans. It is equipped with the officers usual to corporations— a president, a secretary, an attorney or legal adviser. It is required to keep minutes of its proceedings, as all other corporations do. It is given power to contract, to employ a superintendent and a board of consulting engineers and all other functionaries necessary for the carrying on of the business with which it is charged. It is empowered to institute expropriation proceedings, and therefore to sue and to be sued. If such a body is not a corporation, then what attributes must a body possess in order to be a corporation?
Because the statute does not expressly declare that this board shall be a corporation is no reason why it should not be one. This the following extract from Dillon on Municipal Corporations clearly shows: “The settled doctrine is that a corporation may be created by implication, as well as by the use of words. But this implication, to be sufficient, must clearly evince or express the intention to establish or constitute a body politic or corporate; that is, to invest it with corporate powers and privileges. But the absence of express provision respecting the incidents which the law tacitly annexes to corporations is considered immaterial. Thus the omission in the charter or act of the words ‘to plead and he impleaded,’ or ‘to have a seal,’ or ‘to make by-laws,’ would not make it essentially defective. So it would not be essentially defective if the name was omitted, if the name could be *845 ascertained from the terms of the charter or act, or from the nature of the thing or matters granted. Certain attributes or powers are absolutely essential to constitute a body corporate; such as perpetual succession, the right to contract, to sue and be sued as a corporation,” etc. Again: “Although corporations in this country are created by statute, still the rule is here also settled that not only private corporations aggregate, b.ut municipal or public corporations, may be established without any particular form of words, or technical mode of expression, though such words are commonly employed. If powers and privileges are conferred upon a body of men, or upon the residents or inhabitants of a town or district, and if these cannot be exercised and enjoyed, and if the purposes intended cannot be carried into effect, without acting in a corporate capacity, a corporation is, to this extent, created by implication.” Dillon, Mun. Corp. pars. 42 and 43 (3d Ed.).
Defendants give too wide a scope, we think, to the decision of this court in the case of Duffy v. City, 49 La. Ann. 114, 21 South. 179. What was there held is not exactly that the board of commissioners of the port of New Orleans is not a corporation. The statute creating that board had said that it should “have and enjoy all the rights, powers and immunities incident to corporations,” and therefore the court could not possibly have held that the board was not a body corporate. What was held is that the board is not a corporation within the meaning of the limitation placed by the Constitution upon the powers of the Legislature with regard to creating corporations. The later case of State v. Fowler, 49 La. Ann. 1199, 22 South. 623, which does not purport to overrule the Duffy Case, makes this clear; it being there held that, while the drainage commission is a corporation, yet that nevertheless, for the reasons there stated, the constitutional inhibition against the creation of corporations does not extend to it.
Since the writ of quo warranto does not issue to state officers, it becomes necessary to determine whether this board is an agency of the state or of the city of New Orleans. The matter, in our opinion, is free from difficulty. The board was created at the request of the city of New Orleans, or of the taxpayers of the city of New Orleans, for the purpose of administering .affairs strictly local and municipal. Those of the members who are appointed receive their appointment from the mayor. The other members are mostly the officers of the city. But, apart from all this, the following excerpt from the same authoritative work on the law of corporations clearly fixes the character of this board as a municipal agency, to wit;
“Questions have arisen under special constitutional provisions respecting the authority of the Legislature over municipal offices and officers. And here it is important to bear in mind the before-mentioned distinction between state officers — that is, officers whose duties concern the state at large, or the general public, although exercised within defined territorial limits — and municipal officers, whose functions relate exclusively to the particular municipality. The administration of justice, the preservation of the public peace, and the like, although confined to local agencies, are essentially matters of public concern; while the enforcement of municipal by-laws, the establishment of gasworks, of waterworks, the construction of sewers, and the like, are matters which pertain to the municipality, as distinguished from the state at large.” Dillon, Mun. Corp. § 58, citing a long list of authorities, at the head of which is the leading case of People v. Hurlbut, 24 Mich. 44, 9 Am. Rep. 103.
This brings us to the last exception, as to the right of the relator, as a citizen and as a taxpayer, to sue out a writ of quo warranto against the defendants.
Without going into an elaborate history of our law of quo warranto, we will say that, in connection with the question here mooted, our law is substantially an adoption of the common law on the same subject as modified by the statute of 9 Anne, c. 20. The difference to be noted between the two statutes is that, while the statute of Anne seems to require the proceedings to be instituted by the law officer of the state, our Code contents itself with providing that the “order be rendered in the name of the state.” Article 867. In so far as prescribing the interest or quality that the relator should have, the language of the two statutes is identical. The language of the statute of Anne is: “It shall and may be lawful to and for the proper *847 officer in each of the said respective courts, with the leave of the said courts respectively, to exhibit one or more information or informations in the nature of a quo warranto, at the relation of any person or persons desiring to sue or prosecute the same, and who shall be mentioned in such information or informations to be the relator or relators against such person or persons so usurping.”
Article 869 of the Code of Practice reads as follows:
“A mandate to prevent a usurpation of an office in a city or other corporation may be obtained by any person applying for it, and the party to whom it is directed must make his answer in writing within the time allowed by the court, and state the authority under which he exercises his office.”
In the case of King v. Parry, 33 Eng. Com. L. R. 218, which was a case of quo warranto against a town councillor, the court of king’s bench said: “It is not a valid objection to the relator that he is not a burgess. His interest is sufficient if he be subject to the government of the councillors as an inhabitant.”
In the similar case of The Queen v. Kuayle, 39 Com. L. R. 153, the same court said: “An inhabitant of a borough may be a relator though he is not a burgess.”
In Rex v. Clarke, 1 East, 38, Lord Kenyon, in the same connection, said: ■ “If he had shown that his own or other citizens’ privileges had been injured, he would, perhaps, have had reason for preferring this complaint. 1 But the fact is otherwise. He comes here as a perfect stranger to the corporation, prowling into other men’s rights. I do not mean to say that a stranger may not, in any case, prefer this sort of application; but he ought to come to the court with a very fair case in his hands.”
There never was any question under the statute of Anne that a private person without any other interest than such as was shared by all the inhabitants of the town or borough was qualified by himself, and without intervention of the law officers of the state, to stand in judgment in the writ, where the purpose was to settle'rights to an office in a municipal corporation. The ease was different where the writ was directed to the corporation itself. It made no difference, however, that the effect of the suit might be to dissolve the corporation, or to test the legality of its existence. 5 Ad. & E. 613.
In King v. White, 5 Ad. & E. 613, 31 Com. L. 400, Lord Denman, C. J., said: “I think that Rex v. Ogden, 10 B. & C. 230, has been satisfactorily distinguished from the present ease. There is great good sense in the rule there laid down. But the question directly brought before the court was whether a private relator could file a quo warranto information against parties for acting as a body corporate. In Rex v. Corporation of Carmarthen, 2 Burr. 869, an attempt was made by a private relator to raise such a question, and the court held that it could not be done; but they allowed an information to go against the members individually. Then, upon the facts of this case, I think there is doubt enough to make a further consideration of it proper. The rule will, therefore, be absolute.”
In the case of Rex v. Corporation of Carmarthen, here referred to, Lord Mansfield said that the “statute of 9 Anne was calculated to operate only against individuals usurping offices or franchises, and not against any corporation itself as a body. Though the court will grant a quo warranto information, at the instance of a relator, against a member of a corporation, on grounds affecting his individual title, although the same objections apply to the title of every member, yet an information for dissolving a corporation, or of seizing its franchises, cannot be prosecuted but by the authority of the crown or of the commonwealth, or by a public officer in its behalf.”
In the case of Mitchell v. Tolan, 33 N. J. Law, 195, the Supreme Court of New Jersey said:
“As an inhabitant of a city, and subject to its municipal government, he is interested in the due election of the members of the city council;” citing King v. Parry, 6 Ad. & E. 810; The Queen v. Quayle, 11 Ad. & E. 508; Grant on Corporations, 254.
“The statute of Anne,” says High, Ex. Leg. Rem. (2d Ed.) 681, “extended the remedy by quo warranto information, which had before been regarded much in the nature of a prerogative one to private citizens desiring to test the title of persons usurping or exe *849 cuting municipal offices and franchises, and rendered any person a competent relator in such proceeding who might first obtain leave of the court to file an information.”
Thompson, Com. on the L. of Corp., 67 & 75, has the following: “It is said in Pennsylvania — and this probably expresses the law in most American jurisdictions — that in questions involving merely the administration of corporation functions or duties which touch only individual rights, such as the election of officers, or the admission of members, the writ of .quo warranto, or an informaiion in the nature of that writ may issue, either at the suit of the Attorney General, or of any person interested in prosecuting the same;” Citing Murphy v. Farmers’ Bank, 20 Pa. 415.
The Pennsylvania case here referred to is that of Murphy v. Farmers’ Bank, 20 Pa. 418, where the court (Woodward, J.) said: “For the authorities I refer myself to those cited in the argument of the respondent’s counsel. They establish this as the uniform construction in questions involving the existence of a corporation. In questions involving merely the administration of corporate functions, or duties which touch only individual rights, such as the election of officers, admission of a corporate officer, or member, and the like, the writ may issue at the suit of the Attorney General, or of any person or persons desiring to prosecute the same.” The authorities cited in the argument of counsel to which the learned judge referred are the English decisions under the statute of Anne, and some American decisions.
Thus we find that Lord Kenyon would not undertake to say that even a stranger — that is, one who is not even an inhabitant or citizen of the town — might not be a good relator if only he came with a fair case in his hands.
The reasonable presumption is that the framers of our Code, in adopting the language of the statute of Anne prescribing the qualifications of a relator, adopted at the same time the interpretation which had been placed upon that statute.
In opposition to this express statutory law, and this most authoritative interpretation of that statutory law, we are referred to the cases of State v. Mason, 14 La. Ann. 505, and Voisin v. Leche, 23 La. Ann. 25, in which this court held that “no < one but a person pretending to have a right to an office should be permitted to contest the right of the incumbent of that office.”
The second of these eases was founded on the first, and was, besides, an injunction case, and therefore is not in point.
The reasons of the court in the Mason Case are, in our opinion, inconclusive. One is that, if one citizen may sue out the writ, then a hundred or a thousand may. The answer is that the writ of quo warranto is not a writ of right, but lies within the discretion of the court; and that a court which would grant a second writ after a first had been granted would be lending its powers to the gratification of private spite or of 'intemperate civic zeal. The other reason assigned by the court is that “any person” means “any person having an interest,” and that, the statute itself being silent regarding the degree of interest required, the courts must supply the deficiency.” This is true; but for more than a hundred years before the Mason suit was filed the courts of the country from which our Code borrowed this term of “any person” had determined and fixed by a settled jurisprudence what this interest should be, and had settled that any inhabitant of a borough or town has a sufficient interest. Our conclusion must be that our Code, when it says “any person,” means what it says; and that, therefore, the relator, as a resident and a taxpayer of the city, is competent to stand in judgment in the case.
Apart from statutory authority, however, we do not find that the relator has any standing. Nothing shows that, if the defendants were allowed to serve on the board, his burden as a taxpayer would be increased. The members of the board receive no salary or compensation for their services, and non con-stat that the participation of these extra members would have the effect of increasing relator’s taxes. The cases of City Item Co. v. City, 51 La. Ann. 713, 25 South. 313, Handy v. City, 39 La. Ann. 107, 1 South. 593, and State ex rel. Orr v. City, 50 La. Ann. 880, 24 South. 666, áre based upon the direct pecuniary interest which the taxpayer .has in seeing that the amount of his taxes is not increased, no matter to how small an extent. If it were not for this direct pecuniary in *851 terest, he could not, to use the language of the Court oí Appeals of New York, “assume to he the champion of the community, and in its behalf challenge the public officers to meet him in the courts of justice to defend their official acts.” Doolittle v. Supervisors of Broome Co., 18 N. Y. 155.
Having found that the relator was qualified to sue out the writ, we have to inquire into the authority of the respondents. They hold regularly under and by virtue of Act No. Ill of 1902; and the question is whether this act is constitutional. If it is not, it, of course, can confer no authority.
The first ground of unconstitutionality assigned is that the act violates the amendment to the Constitution proposed by the joint resolution No. 4 of the Extra Session of 1899, adopted and incorporated into the Constitution at the election of April, 1900. The contention is that by said amendment the said sewerage and water board was made a constitutional board, in whose organization it was not within the power of the Legislature to make any change, and that this increase of membership is an attempt to make such a change. There is no doubt that the addition of these members does change the organization of the board. The question is, therefore, whether by the constitutional amendment the board, as organized by the act of 1899, was adopted into the Constitution, and placed beyond the reach of legislative amendment.
Before quoting the constitutional amendment, we will give its history.
To begin at the beginning, we will say that the people of New Orleans, realizing that the time had come for their city to be provided with better systems of sewerage and water, desired to increase their taxation for those purposes, and that, ’in order to do this, it was necessary to submit the matter to a vote of the property taxpayers, in accordance with the form prescribed by law, and that one of these forms was the presenting to the city council a petition, signed by one-third of the taxpayers, setting forth the rate of the tax, the number of years for which it was to run, and the purposes for which it was to be levied.
In April, 1899, such a petition was presented to the city council; and, since one of the disputed points in the case is with regard to whether there were contained in this petition any conditions other than those respecting the rate, the duration, and the purpose of the proposed tax, we will transcribe the document in full, and let it speak for itself. It is as follows:
“To the Honorable Mayor and Council of the City of New Orleans:
“The undersigned property taxpayers of the city of New Orleans hereby petition you to levy upon all the property of this city a special tax of two mills per annum for forty-three years, beginning with and including the year 1899. The proceeds thereof shall be applied in such ratio as may be required to the following purposes of permanent public improvement, to wit:
“(1) To acquire title by the city, by construction or purchase, or both, to a system of waterworks; to the extension thereof throughout the city, inclusive of the Fifth District; and to the purification of the water supply therefrom.
“(2) To the construction throughout the city, inclusive of the Fifth District, of a free sewerage system, with free water therefor; the title whereof shall be in the city.
“(3) To the completion of the public drainage system of the city of New Orleans, inclusive of the Fifth District, now in process of construction.
“We further petition that the council will, as soon as possible after this tax is voted, obtain legislative and constitutional authority to capitalize on the basis of the present assessment the whole proceeds of this special tax, added to the proceeds on the same basis of one-half the surplus of the present 1 per cent, debt tax (already dedicated by law to drainage purposes), by issuing bonds dated July 1, 1900, having fifty years to run, bearing not more than 4 per cent, interest, and to be sold only as needed, at not less than par and accrued interest, so that all these works may be completed immediately, and that the interest on said bonds after 1942, and the whole principal thereof, shall be paid after said date by the continuation thereafter of the present 1 per cent, debt tax.
“We further petition that, if the assessed value of the city shall in the future increase to such a figure as to make one-half the surplus of said 1 per cent, debt tax sufficient to pay the whole or the larger portion of the *853 interest on the bonds so issued, then that in all such years there shall be a corresponding diminution in the amount of such special tax.
“We further petition that the issuance and sale of said bonds shall be placed under the supervision and control of the board of liquidation of the city debt, and that the proceeds of said tax shall be paid over as collected to said board.
“We further petition that when said special tax is voted the council will organize a ‘Sewerage and Water Board,’ to be composed of the drainage commissioners and a taxpayer from each of the seven municipal districts, to be appointed by the mayor, with the consent of the council, or elected by the property taxpayers for terms not exceeding twelve years, for the purpose of constructing, controlling, maintaining, and operating said water and sewerage systems.
“We further petition that at the election called to take a vote on said tax the council will submit to the property taxpayers the question as to how said seven commissioners shall be named, whether by election by the property taxpayers or by appointment by the mayor, with the consent of the council; and, if the majority in number and amount of those voting at said election shall select either of said methods, then the council shall embody the method so selected in the ordinance levying the tax, and seek legislative and constitutional authority for such method of election; and in case the majority, both in number and amount, voting at such election, do not select either one of said methods, then the mayor shall appoint said commissioners, with the approval of the council, in such manner that the term of one commissioner shall expire every two years; and until such board can be fully organized we petition that the present drainage commission shall perform the duties of said board.
“We further petition that the contract for the above work shall be let in such manner as to cover the whole city, the Fifth District i included, at the same time, and be prosecuted ■jin such manner that it shall be completed ¡throughout the city, the Fifth District inelud- ' ed, as far as possible, at the same time.
“We further petition that, if the city cannot get proper legislative and constitutional authority to issue the bonds aforesaid prior to January 1, 1901, then that said special tax shall thereafter cease and determine, and the proceeds of said tax for the years 1899 and 1900 shall be paid over to the drainage commission, to be used for drainage purposes.”
Upon being presented with this petition, the council of the city of New Orleans, by Ordinance No. 15,214 O. S., approved April 26, 1899, in the preamble of which ordinance the petition referred to was embodied, ordained as follows:
“Section 1. Be it ordained by the common council of the city of New Orleans, that a special election is hereby ordered to be held as provided in article 232 of the Constitution of the state of Louisiana and Act No. 131 of 1898, the date of which is to be fixed by proclamation of the mayor, not sooner, however, than thirty days after the official adoption of this ordinance, and that at said election there shall be and is hereby submitted to the property taxpayers of the city of New Orleans entitled to vote at such election under the Constitution and laws of this state, the proposition to levy on all property in the city of New Orleans a special tax of two mills on the dollar for forty-three years, beginning with and including the year 1899, for water, sewerage and drainage purposes, on the terms and conditions set forth in the foregoing petition.
“Sec. 2. Be it further ordained, etc., that there shall also be submitted to the property taxpayers voting at said election the question as to how the seven commissioners, one from each of the seven municipal districts, who are to be members of the ‘sewerage and water board,’ shall be chosen — whether by election by the property taxpayers or by appointment by the mayor, with the consent of the council.
“Sec. 3. Be it further ordained, etc., that the official ballot to be used at said election shall be printed as follows:
“ ‘Official Ballot.
“ ‘For the special tax of two mills for forty-three years, to be devoted to water, sewerage and drainage, under the terms and conditions set forth in the property taxpayers’ petition.
“ ‘Against the special tax of two mills for forty-three years, to be devoted to water, sewerage and drainage, under the terms and *855 conditions set forth in the property taxpayi ers’ petition.
“ ‘For the appointment of the seven commissioners by the mayor, with the consent of the council.
‘For the election of the seven commissioners by the property taxpayers.’
“Every voter shall indicate his or her vote by stamping with an official stamp the proposition he votes for.”
It is to be observed that this ordinance discriminates between the rate, duration, and purposes of the tax on the one hand, and the terms and conditions of the taxpayers’ petition on the other. Its language is that the proposition is to vote “a special tax of two mills on the dollar for forty-three years, beginning with and including the year 1899', for water, sewerage and drainage purposes, on the terms and conditions set forth in the foregoing petition.” The rate, duration, and purpose of the tax are specified, and the statement is made that the tax, as thus described, is to be voted for “on the terms and conditions set forth in the taxpayers’ petition.”
It will be observed further that also in the ballot this separation between the rate, duration, and purposes of the tax on the one hand, and the. terms and conditions set forth in the taxpayers’ petition on the other, is studiously, carefully, and expressly made. So that the tax voted for was not an unconditional tax “of two mills for forty-three years, to be devoted to water, sewerage, and drainage”; but it was that same tax “under the terms and conditions set forth in the taxpayers’ petition.”
It is noteworthy, also, that the petitioners were not willing to leave to the discretion of the constituted legislative authorities the determining of the manner of the selection of the seven commissioners who were to be chosen from among the general body of the taxpayers, but that in their petition they prescribed that the matter should be submitted to the vote of the taxpayers. Our purpose in adverting to this circumstance is to show the importance the taxpayers attached to the matter of the organization of the board to whose administration the proceeds of the tax would have to be confided.
The election thus ordered was duly held, and resulted favorably to the tax. In making proclamation of the result the Secretary of State announced that there were so many votes for and so many votes against “the special tax of two mills for forty-three years, to be devoted to water, sewerage, and drainage under the terms and conditions set forth in the taxpayers’ petition.”
Thus again were kept strictly separate and apart the rate, duration, and purposes of the tax on the one hand, and “the terms and conditions set forth in the taxpayers’ petition” on the other.
Immediately upon the heels of the Secretary of State’s proclamation, the council adopted an elaborate ordinance, designed to carry out the scheme embodied in the taxpayers’ petition. This ordinance was drafted strictly in accordance with the petition. It levied the tax, and constituted a sewerage and water board, etc. The tax thus levied was the tax voted for; that is, a tax conditional “upon the terms and conditions set forth in the taxpayers’ petition.” The ordinance expressly so declares. It provides that whereas, the council has submitted to the vote “of the taxpayers a proposition to vote a tax of two mills on the dollar for forty-three years, upon the terms and conditions set forth in the petition of the taxpayers made the basis of said ordinance, the proceeds whereof are to be devoted to certain permanent public improvements; and whereas the election has been held and the tax carried, therefore a tax of,” etc., “is hereby levied.”
Section 11 of this ordinance provided as follows:
“That for the purpose of constructing, controlling, maintaining and operating the public water system aud the public sewerage system of the city of New Orleans, there is hereby organized and constituted a ‘sewerage and water board,’ to be composed of the members of the drainage commission as now constituted and a property taxpayer of two years’ previous residence in each of the seven municipal districts of the city of New Orleans, to be appointed by the mayor, for twelve years, with the consent of the council. The first appointments to be made under this ordinance shall be one for two, one for four, one for six, one for eight, one for ten, one for twelve and one for fourteen years, so that one new commissioner shall be ap *857 pointed every two years, and on the expiration of each of the commissioners’ term his successor shall be appointed for twelve years. All vacancies shall be filled by appointment by the mayor, with the consent of the council, for the unoxpired term. In case any taxpayer member of the ‘sewerage and water board’ shall be elected to any office or receive any appointment which would make him a member of the drainage commission, or shall remove his residence from the district from which he was appointed, or shall cease to be a property taxpayer, his membership of sáid board as such taxpayer shall be ipso facto vacated and his successor shall be immediately appointed, as aforesaid: provided, however, that no person who is a stockholder in any sewerage or water works company shall be eligible by appointment to said board. In case any additional memberships are hereafter added to the drainage commission as now constituted, the incumbents thereof shall not constitute a part of said board; and in case any of the present memberships of said drainage commission are stricken therefrom, the said board shall remain diminished by such reduced membership; provided, however that the maypr of the city and the chairman of the three city committees of finance, budget and water and drainage, and the president and one designated member of the board of liquidation shall always be members of said board, even if they should be excluded from the drainage commission, or the said commission should be abolished.”
The board thus created never organized. An extra session of the Legislature was called, and Act No. 6 of 1899 was passed, and also a joint resolution proposing an amendment to the Constitution, both having in view the carrying out the purposes of the voting of the tax.
The preamble of'Act No. 6 reads as follows:
“Whereas, due notice of this act has been published in the city of New Orleans for more than thirty days prior to its introduction into the General Assembly, and due evidence thereoi; has been exhibited in the General Assembly; and,r'
“Whereas, on June 6, 1899, the property taxpayers of the city of New Orleans, in due form of law, voted a special tax of two mills on the dollar for forty-three years, beginning with the year 1899, upon certain conditions set forth in the property taxpayers’ petition, made the basis of said election, the proceeds whereof are to be exclusively devoted in such ratio as may be required to the following purposes of permanent public improvement, to wit:
“(1) To acquiring title by the city, by construction or purchase, or both, to a system of waterworks, to the extension thereof throughout the city, inclusive of the Fifth District, and to the purification of the water supply therefrom.
“(2) To the construction throughout the city, inclusive of the Fifth District, of a free sewerage system, with free water therefor, the title whereof shall be in the city.
“(3) To the completion of the public drainage system of the city, of New Orleans, inclusive of the Fifth District, now in process of construction; and,
“Whereas, the common council of the city of New Orleans did, by Ordinance No. 15,391 C. S., approved June 22nd, 1899, levy the said tax upon the said conditions, and provided for the establishment of said public systems of sewerage and water; and,
“Whereas, the said conditions so imposed upon the said tax require legislative action to make them thoroughly effective, so that the purposes of said tax levy may be fully carried out.”
Let it be noticed that again in this preamble the rate, duration, and purposes of the tax are segregated .from “the terms and conditions set forth in the taxpayers’ petition,” and that the said conditions are expressly stated to have been imposed upon the tax, and the tax to have been levied under the conditions.
Section 8 of this act is a re-enactment, word for word, of section 11 of the city ordinance mentioned above.
Section 35 of the act provides as follows:
“That as it is proposed to have this act ratified by an amendment to the Constitution, it is hereby specially declared to be the intent of this act and of said ratifying constitutional amendment that the General Assembly reserves the right and power to amend this act in any respect not violative of the conditions upon which the said special tax was voted by the property taxpayers of *859 the city of New Orleans, and not impairing the vested rights or the contract rights of the holders of the bonds issued under its provisions.”
The joint resolution proposing the constitutional amendment in question ran through the Legislature at the same time as the act of 1899. It is a part of the public history of the state, of which this court can take judicial cognizance, that the extra session of the Legislature was called at the instance of the promoters of this sewerage and water scheme, and that the act of 1899 and the constitutional amendment were adopted at their instance.
We shall now give the amendment, or rather the joint resolution proposing it, and then proceed to give what, in the light of the foregoing, is, we think, the proper construction to place upon it with regard to whether it adopted and embodied into the Constitution that part of the act of 1899 providing for the organization of the sewerage and water board. The joint resolution reads as follows:
“Joint Resolution,
“Proposing an amendment to the Constitution of the State of Louisiana, relative to ratifying and carrying into effect a special tax levied in the city of New Orleans for certain public improvements, and to establish therein public systems of sewerage and water, the issuance of bonds therefor, and the providing ways and means to pay the principal and interest of said bonds.
“Section 1. Be it resolved by the General Assembly of the State of Louisiana, two-thirds of all the members elected to each house concurring, that the following amendment to the Constitution of ‘■'■'e state be submitted to the electors of the state at the next general election for representatives in the Legislature to be holden on the Tuesday next following the third Monday in April, A. D. 1900, to wit:
“Article 1. The special tax for public improvements voted by the property taxpayers of the city of New Orleans on June 6, 1899, and levied by the city council, by Ordinance No. 15,391, approved June 22, 1899, is hereby ratified and its validity shall never be questioned. The special act adopted by the Legislature at the special session held on August 8, 1899, constituting the sewerage and water board of the city of New Orleans, authorizing the city of New Orleans to issue bonds, and providing the means to pay the principal and interest thereof, and for other purposes cognate to the purposes of the special tax aforesaid, is hereby ratified and approved, specially including the therein reserved legislative right to amend the same; and all provisions of the present Constitution in conflict with the provisions of the said act and this amendment are, to that extent, and for that purpose only, repealed.
“Sec. 2. Be it further resolved,” etc., “that, on the official ballots to be used at said election shall be placed the words ‘Eor the City of New Orleans Public Improvement Amendment,’ and the words ‘Against the City of New Orleans Public Improvement Amendment’; and each elector shall indicate, as provided in the general election laws of the state, which of the propositions — ‘for’ or ‘against’ — he votes for.”
Acts 1902, No. 4.
The language of the amendment is that the act of 1899 is ratified and approved. To “ratify” and “approve” are terms which, in their abstract meaning, are not the equivalents of such terms as “to make part of” or “to incorporate into.” So that if the act of 1899 has been made part of and incorporated into the amendment, this result has not been brought about by the force of the terms “ratify” and “approve” according to the abstract meaning of these terms. Between the ratifying of a statute and the incorporating of it into the organic law of the state there is a patent difference. All valid enactments of the Legislature may be said to be ratified. They are ratified and approved by anticipation; but they do not, on that account, become part of the organic law. The difference between such a ratification and one coming after the fact would seem to be nothing more than that existing between a prospective and a retrospective approval; that is to say, for all practical purposes, no difference at all. Taking the terms “ratify” and “approve” in their abstract meaning, therefore, the' amendment is susceptible of the interpretation of amounting to nothing more than to a mere declaration *861 that the act is made valid and constitutional, regardless of what there might be in the Constitution to the contrary.
But this amendment has to be viewed in the light of what it unquestionably was, namely, a mere step forward in the course of the proceedings that had begun by the presentation of the taxpayers’ petition. It has to be read in connection with the circumstances surrounding its adoption. The words “ratify” and “approve” are not to be taken according to their abstract meaning, but according to the meaning attaching to them in the connection in which they are used in the amendment; provided, of course, that this meaning is made evident by the context.
The meaning is, we think, thus made evident as an effect of the clause by which the right to amend the act is reserved to the Legislature. The right and power to amend its own enactments falls so clearly within the prerogatives of the Legislature that the legislator who should have misgivings on the subject, and think that a reserve of the right was necessary, would simply be an idiot. When, therefore, the framers of the amendment put into it a reservation of the legislative right of amendment, they did so because the act was to cease to be a mere legislative enactment and become a part of the Constitution. The insertion of this reserve into the amendment is explicable on no other theory.
How the framers of the amendment understood the matter is not left to inference. In making the reservation in section 35 of the act, they explain that they do so because “it is proposed to have the act ratified by an amendment to the Constitution.”
So much for the analysis of the terminology of the amendment. Let us now consider this piece of the legislation in the light of its history. The taxpayers had not voted an unconditional tax. Their petition had not contented itself with asking that a tax be voted. It had gone on, and asked at the same time that a certain board be created to have the administration of the proceeds of the tax, specifying the manner of the selection of the personnel of the said board. Nay, it had gone further, and sought to regulate to some extent the administration of the proceeds of the tax by prescribing that the entire avails should be bonded, and that, if this could not be done, then that the whole tax scheme should fall through. These requests had at every step of the proceedings been recognized as conditions imposed upon the levy of the tax. The ordinance providing for the election had recognized and respected these conditions. Every ballot cast in the election had been east with respect to them. The Secretary of State, in proclaiming the adoption of the tax, had stated that the tax was adopted subject to them. The tax had been actually levied subject to them, and not otherwise. The Legislature, in providing the requisite legislation for carrying out the scheme of the tax, had expressly recognized and duly observed them. The extra session of the Legislature had been called, not for the purpose of imposing upon the taxpayers of New Orleans an unconditional tax, whose proceeds might go into the hands of the city authorities to be expended as the money came in, but for the purpose of providing the legislation needed to carry out the plan or scheme which the taxpayers of the city had devised for supplying their city with sewerage and water. The Legislature had faithfully accomplished that purpose, adhering strictly to the plan or scheme, except in a harmless particular, to which nobody objected. The drafting of the act and of the joint resolution proposing the amendment was the handiwork of the taxpayers themselves through their chosen agents, of which fact this court may take judicial notice as of a part of the public history of the state. There was no reason why the tax voted should not be adopted into the Constitution as voted; that is, with the conditions attached to it which the taxpayers had coupled with it in voting it. There was not on anybody’s part any idea of incorporating into the Constitution any other and different tax. The amendment was but the culminating step in the course of the proceedings of which the petition had been the initiatory move. In the light of these facts, what did the amendment mean when it said that “the special tax * * * voted by the property taxpayers of the city of New-Orleans on June the 6th, 1899, and levied by the city council, * * * is hereby ratified, and its validity shall never be questioned”? Did it mean that the tax was ratified and approved as voted and levied— *863 that is. coupled with the conditions which the taxpayers had attached to it; or did it mean that the tax was ratified and approved shorn of all the conditions under which it had been levied?
If the latter was meant, and if the provisions of the act of 1899 conserving and carrying out these conditions were not at the same time adopted into and made part of the amendment, then as soon as the amendment had been favorably voted on at the election of April, 1900, the tax itself became anchored in the Constitution, but the proceeds of the tax remained at the discretion of the Legislature, with respect to their administration, to be handled by the city council, and spent as the money came in, if so pleased the Legislature. The rule is that, in the absence of constitutional limitation, the Legislature is vested with all the powers of the government belonging to the legislative department. If, therefore, the provisions contained in the act of 1899 for the bonding of the proceeds of this tax and for the constituting of a special board for their administration, were not incorporated into the amendment, the Legislature was at perfect liberty not to bond the avails of the tax, and not to constitute the board. The rate, duration, and purposes of the tax would have been incorporated into the Constitution, and, besides, would have been fixed by the joint authority of the Constitution and of the vote of the taxpayers, and be, in consequence, beyond legislative control; but the administration of the proceeds of the tax would have remained entirely and completely at the discretion of the Legislature, excepting, of course, that whatever body was intrusted with it would have had to be constituted in accordance with articles 319 and 320 of the Constitution. The City Council, however, would have been par excellence such a body.
We hardly think it would be taking a practical or sensible view of the situation to interpret the amendment so as to leave the matter of the bonding vel non of the avails of the tax, and the matter of the constituting vel non of a special board to administer these avails, within the discretion of the Legislature, while the tax itself was being secured hard and fast in the framework of the Constitution. We think that the practical and sensible view to take is that the agents of the taxpayers who framed the amendment did their work with a view to conserving these conditions; in other words, that the amendment means exactly and precisely what it says, namely, that “the tax voted” and “the tax levied” is ratified, and shall never be questioned; that is, the tax as voted and as levied, subject to the conditions upon which it was voted and levied. Any other interpretation would place the taxpayers in the predicament of the frogs that applied to Jupiter for a king, and got a stork, which swallowed them all. These taxpayers would have applied to the sovereign people for help, and would have got an amendment devouring- all their cherished conditions. We are bound to conclude that through this amendment the act of 1899 became incorporated into the Constitution, including the reserved right to the Legislature to amend; and that, unless the right to alter the organization of the sewerage and water board was included in this reserve, the act of 1902, in so far as it alters the constitutions of said board, is in contravention with the Constitution, and null and void, and incapable of conferring aDy authority upon the respondents.
It is contended that in speaking of the conditions set forth in the taxpayers’ petition, section 35 of the act of 1899 and the constitutional amendment ratifying the reserve of right and power made in said section had reference to the rate, the. duration, and purposes of the tax, and not to the several requests or conditions contained in the taxpayers’ petition.
This contention, we think, is flatly contradicted by the ordinance calling the election, by the ballot used in the election, by the proclamation of the Secretary of State announcing the result of the election, by the ordinance levying the tax, and, finally, by the act itself in which the reservation is found. In the course of the statement of facts, we called attention to the manner in which the rate, duration, and purposes of the tax had been distinguished throughout at every step of the proceedings from “the terms and conditions set forth in the taxpayers’ petition,” and it can hardly be necessary to travel again over the same grounds.
There is this much to be added, however: that the reservation is made exclusively with *865 regard to what is contained in the act itself. The language is that “the General Assembly reserves the right to amend this act.” No reservation is made in connection with matters not included in the act; matters not dependent upon the act for existence, and not governed by it. Now, the rate, duration, and purposes of the tax were matters with which the act had nothing whatever to do, and which were as much beyond the control of the Legislature as any article in the Constitution of the United States might be said to be. For the Legislature to have said that it did not reserve the right to amend the rate, duration, and purposes of this tax, would have been just as practical as to have said that it did not reserve the right to amend any of the acts of Congress.
If any further proof were needed as to what conditions were referred to in the said reserve of right to amend, such proof would be found in the last two whereases of the preamble of the act, which are as follows:
“Whereas the common council of the city of New Orleans did, by Ordinance No. 15,-391, C. S., approved June the 22nd, 1899, levy the said tax upon the said conditions, and provided for the establishment of said public systems of sewerage and water; and
“Whereas, the said conditions so imposed upon the said tax require legislative action to make them thoroughly effective, so that the purposes of the said tax levy may be fully carried out.”
It is here said that “the said conditions so imposed upon the said tax require legislative action to make them thoroughly effective.” Now, the rate, duration, and purposes of the tax not only did not require legislative action to be made effective, but were, as just stated, as much beyond the scope of any action of the Legislature as are the acts of Congress or the articles of the Constitution of the United States, and were, therefore, just as effective with as without the contemplated legislative action. On the other hand, the matters of the bonds, of the authorizing the board of liquidation to have charge of the proceeds of the tax, of the creating of a special board to have charge of the work, did need legislative action to be made thoroughly effective. They, therefore, were the conditions referred to as having been imposed upon the tax.
We must hold that the conditions of the taxpayers’ petition referred to in the reserve were not the rate, duration, and purposes of this tax, but were “the terms and conditions set forth in the taxpayers’ petition under which the tax had been voted,” and that one of the chief of these conditions was the one bearing upon the manner of the organization of thé board which was to administer the proceeds of the tax.
It is argued that, if this sewerage and water board has become a constitutional board, then that during the life of this board — 43 years — it will not be possible to change the form of the government of the city of New Orleans, because the mayor and the chairmen of the committees of budget, water and drainage, and finance are made members of said board; the proposition being that, in order to continue to be members of the board, the said officials will have to continue in then-same functions, and under their same official titles.
We do not think that the situation would be so serious as all this. If the city ceased to have an officer called by the official name of “mayor,” it would be forced to have some other official filling approximately the same functions, and the courts would experience no difficulty whatever in holding that this official took the place of the mayor on the board; and so with the other city officials. If the levee board ceased to exist, its members would, ipso facto, cease to be members of the drainage commission, and, as a consequence, would, under the operation of the act of 1899, cease to be members of the sewerage and water board. So far as the members of the board of liquidation are concerned, provision is made in the act of 1899 for the'ir continuation in office during the whole time of the existence of the sewerage and water board, and, this provision having been one of the conditions of the taxpayers’ petition, it has gone into the Constitution with the other conditions of the said petition.
It is well to note, in passing, that, while the act of 1899 is adopted into the Constitution as a whole, it is so adopted with special reservation of the right of the Legislature to amend, except in so far as might be violative of the conditions of the taxpayers’ petition; and that the effect of this reserve was to withhold from incorporation into the Consti *867 tution all the parts of the act not covered by the conditions of the taxpayers’ petition. This result follows, ex necessitate, from the legislative right to amend. Since the Legislature cannot amend the Constitution, it follows that the act, in so far as amendable by the Legislature, is no part of the Constitution, and it is amendable in all respects except in violation of the conditions of the taxpayers’ petition. It is well to note also that, while the Legislature is prevented by a constitutional provision from adopting or amending laws by reference to their title, but must re-enact the law in full as adopted or amended, the same restraint does not tie the hands of the people in amending their Constitution, and that, therefore, the people, if they so wish, are at liberty to adopt laws into their Constitution by reference to the title of these laws.
It is said, also, that the suggestion of the petition with regard to the organization of the sewerage and water board was never carried out, the ordinance adopted for the purpose of carrying out the petition having provided for a differently constituted board, and the board so provided for not having ever organized, but having been entirely supplanted by the legislative board created by the act of 1899; and that the latter board was and remained subject to the legislative control, it being purely a legislatively created board.
We find no force in this argument. The section 8 of the act of 1899 providing for the sewerage and water board was a verbatim eopy of the section 11 of the council ordinance adopted to carry out the petition; and this ordinance, very far from seeking to violate the conditions of the petition, sought, on the contrary, to carry them out faithfully and carefully. In the petition the eventuality of the reduction of the membership of the drainage commission or of the total abolition of the commission had not been foreseen and provided for; and it became necessary to remedy this in the ordinance carrying out the petition, and provision covering this eventuality was accordingly made. But this was a mere interpretation of the petition, and strictly in line with it. Nobody looked upon the matter in the light of a change in the conditions of the petition, and that idea is now suggested for the first time. Under these circumstances, the condition of the petition with respect t-o this board must be held to have been what both by the ordinance and by the act of the Legislature it was thus interpreted to have been, and it must be held to have been carried into the Constitution as thus interpreted.
Another ground of unconstitutionality relied upon is that by articles 319 and 320 of the Constitution the officers charged with the exercise of the police power and with the administration of the affairs of the municipalities of the state must be chosen by election, and the members of boards or commissions must be either elected by the city councils or appointed by the mayors of such municipalities; and that said act of 1902 undertakes to make the commissioner of labor and statistics, three members of the boards of commissioners of the Orleans Levee District, and one member of the board of commissioners of the port of New Orleans, all of whom are appointed by the Governor, members ex officio of the sewerage and water board.
These articles of the Constitution read as follows: “Art. 319. The electors of the city of New Orleans, and of any political corporation which may be established within the territory now, or which may hereafter be, embraced within the corporate limits of said city, shall have the right to choose the public officers, who shall be charged with the exercise of the police power and with the administration of the affairs of said corporations in whole or in part.
“Art. 320. This article shall not apply to the board of liquidation of the city debt nor shall it be construed as prohibiting the establishment of boards of commissioners the members of which are elected by the council or appointed by the mayor with consent of the council. As to all other existing boards or commissions affected by it, said article shall take effect from and after the first municipal election which shall be held in the city of New Orleans after the adoption of this Constitution: provided, that nothing herein contained shall be construed as to prevent the Legislature from- creating boards or commissions wdiose powers shall extend in and beyond the parish of Orleans, or as affecting present boards of that character, or the board of directors of the public *869 schools: provided, that hereafter, in creating any board with such powers, or in filling vacancies therein, at least two-thirds of the members thereof shall he from the city of New Orleans, and elected by the people or council thereof, or appointed by the mayor as hereinabove provided.”
That the sewerage and water board is “charged with the exercise of the police power and with the administration of the city of New Orleans in whole or in part,” is undeniable, and not denied. It would seem, therefore, that the act is in direct contravention of these articles of the Constitution.
It is contended that it is not, because these articles do not apply to boards whose powers, like those of the sewerage and water board extend beyond the limits of the parish of Orleans. The part of the act conferring upon the sewerage and water board powers extending beyond the limits of the parish of Orleans is contained in section 17 of the act, and reads as follows:
“Said board shall have authority to expropriate any property in any of the parishes adjoining the parish of Orleans that it may find convenient and necessary for the proper execution of the powers herein granted to it, and to extend its work into such parish for the benefit of the city of New Orleans, and to have jurisdiction and authority in such parish over said works therein situated.”
It is perfectly plain that the purposes of the creation of this board pertain wholly and exclusively to the city of New Orleans; that the board is as essentially local as the city council is, or any other functionary having charge of the affairs of the city; and that this authority to reach out into neighboring parishes is merely incidental, and for convenience. When “convenient and necessary for the proper execution of the powers herein granted,” is the language of the act. If this were not so, if the powers of the board were to be exercised in part for the benefit of this outside territory, the situation would be that the city of New Orleans was being taxed for the benefit of these neighboring parishes. Nobody pretends to say that the tax is not strictly and exclusively for the benefit of the city of New Orleans. This shows that the board also is, since the board is nothing more than an agency created specially to carry out the purposes of the tax.
To say that in speaking of the boards whose powers shall extend beyond the parish of Orleans the article of the Constitution has reference to boards of such strictly local functions as this, is palpably to misinterpret the article. The article evidently has reference to boards created as much for the benefit of the outlying territory- as of the city — such boards, for instance, as the board of commissioners of the port of New Orleans. That board has Jurisdiction over the port of New Orleans, and that port embraces territory outside of the city. The Drainage Commission Case, 49 La. Ann. 1199, 22 South. 623 (State v. Flower), is not in point. The question there was whether the duties with which the board is charged are of mere local concern or pertain to the state at large. No one pretends that matters of sewerage and water are not of purely local concern. The authorities cited hereinabove showing the municipal character of the sewerage and water board are in point also in the present connection.
If the view contended for prevailed, the guaranties of articles 319 and 320 would amount to nothing at all; since it would always be possible to extend into the neighboring parishes the powers of any board that might be created, and thereby circumvent the article. There would be an adherence to the letter of the Constitution, and an evident violation of its spirit. What was said by the Court of Appeals of the state of New York in the case of People v. Albertson, 55 N. Y. 55, is apposite in this connection, to wit:
“A written Constitution must be interpreted and effect given to it as the paramount law of the land, equally obligatory on the Legislature as upon other departments of government and upon individual citizens, according to its spirit and the intent of its framers, as indicated by its terms. An act-violating the true intent and meaning of the instrument, although not within the letter, is as much within the purview and effect of a prohibition as within its strict letter; and an act in evasion of the terms of the Constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purpose is as clearly void as if in express terms forbidden. A written Constitution would be of *871 little avail as a practical and useful restraint upon the different departments of government if a literal reading only was to be given to it to the exclusion of all necessary implication, and the clear intent ignored, and acts palpably in evasion of its spirit should be sustained as not repugnant to it. * * * Usurpation of power, or the exercise of power in disregard of the express provision or plain intent of the instrument, as necessarily implied from all its terms, cannot be sustained under the pretense of a literal interpretation, or in deference to the judgment of the Legislature or some supposed necessity, the result of a changed condition of affairs.”
The decisions in the cases in 41 La. Ann. 156, 6 South. 592 (Police Board Case), and 49 La. Ann. 115, 21 South. 179 (Dock Board Case), and 49 La. Ann. 1199, 22 South. 623 (the Drainage Commission Case), are.not in point, for the reason that since they were rendered the words, “and with the administration of the affairs of said corporation in whole or in part,” have been added to the article. To say that to administer the sewerage and the waterworks of a city is not to administer its “affairs in whole or in part” would be to go squarely against a plain proposition.
In the leading case of People v. Hurlbut, 24 Mich. 44, 9 Am. Rep. 103, where the court was not, as here, enforcing a constitutional prohibition, but simply the general principles of constitutional law involved in the matter, Judge Cooley, the eminent jurist and distinguished author of many textbooks of universal authority, says:
“We have before us a legislative act creating for the city of Detroit a new board, which is to exercise a considerable share of the authority usually possessed by officers locally chosen; to have general charge of and * * * to make contracts for public works on behalf of the city, and to do many things of a legislative character which generally the common council of cities alone is authorized to do. The Legislature has created this board, and it has appointed its members. * * * For those classes of officers whose duties are general — such as the judges, the officers of militia, the superintendents of police, of quarantine, and of ports, by whatever name called — provision has, to a greater or less extent, been made by state appointment. But those aré more properly state than local officers. They perform duties for the state in localities, as collectors of internal revenue do for the general government; and a local authority for their appointment does not make them local officers when the nature of their duties is essentially general. In the case before us the officers in question involve the custody, care, management, and control' of the pavements, sewers, waterworks, and public buildings of the city, and the duties are purely local. The state at large may have an indirect interest in an intelligent, honest, upright, and prompt discharge of them; but this is on commercial and neighborhood grounds, rather than political, and is not much greater or more direct than if the state line excluded the city. * * * It would be the boldest mockery to speak of a city as possessing municipal liberty where the state not only shaped its government, but, at discretion, sent in its own agents to administer it; or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control of their local affairs, or no control at all.”
The constitutionality of the act of 1902 is assailed on the further ground that the act contains two objects, only one of which is mentioned in its title, contrary to article 31 of the Constitution, which provides that “every law enacted by the General Assembly shall embrace but one object, and that shall be expressed in its title.”
The two objects referred to are: First, the amending of certain sections of the act of 1899; and, second, the merging of the drainage commission into the sewerage and water board. These two objects, it is contended, are not germane, and the title of the act mentions only one of them, namely, the amending the act of 1899.
If the title of the act is defective, as here contended, the entire act is not, for that reason, invalid, but only that part for which no provision is made in the title; that is to say, that' part merging and abolishing the drainage commission. Cooley, Const. Lim. p. 177 (6th Ed.). The contention resolves itself, therefore, into the question of whether the drainage commission has been abolished or not — a question outside of the scope of the present proceeding, which is a writ of quo *873 warranto to test the right of the defendants to membership in the sewerage and water board. If that part of the act making the defendants members of the sewerage and ■water board is valid, the relator must fail, even though the part of the act abolishing the drainage commission should be invalid. The question is, therefore, outside of the present inquiry, and we pretermit the examination of it.
(March 2, 1903.)
Another ground of attack is that the act of 1902 is violative of article 210 of the Constitution, which provides that no person shall be eligible to any office, state, judicial, parochial, municipal, or ward, who is not a duly qualified elector of the judicial district, municipality, or ward wherein the functions of the said office are to be performed; that the commissioner of labor and statistics is made an ex officio member of the sewerage and water board, although said officer is not by law required to be an elector of the parish of Orleans, and might be an elector of another parish.
In opposition to this contention it is said that the incumbent of the office for the time being happens to be an elector of the parish of OUeans, and that, therefore, the complaint is groundless. This reply is fallacious. It is not the present incumbent individually who is made -a member, but the incumbent of the office, whoever he might be; and to be an elector of the parish of Orleans is not prescribed among the qualifications of the incumbent of the office. This ground of unconstitutionality must be sustained. Whether it involves the unconstitutionality of the entire act is a question the determination of which is not necessary to the decision of this suit. We will therefore not examine it.
Relator claims that, if the act is found to be unconstitutional with respect to the increase of the membership of the board, then that it is also unconstitutional on the point of the change made in the number required to constitute a quorum and to constitute a voting majority for passing certain specified measures; and he prays that the act be declared unconstitutional in these respects also.
We cannot consider these' points in the present case. The inquiry must be confined strictly to the right of the defendants to sit on the board. This matter of the number required to constitute a quorum and a voting majority for particular business is matter pertaining to the board itself, not to the individuals claiming membership in it, and the writ in this case is directed exclusively against the individuals. We cannot, in this case, go further than to inquire into the right of the defendants to membership in the board.
For the foregoing reasons, it is ordered, adjudged, and decreed that the judgment of the lower court be set aside, and that the act of the General Assembly No. Ill, approved July 8, 1902, be, and the same is hereby, declared to be unconstitutional, null and void, in so far as it increases or changes the membership of the sewerage and water board created by the act of the General Assembly No. 6 of the Extra Session of 1899; and that the respondents, herein, Dr. Quitman Kohnke, Thomas Harrison, George G. Fredericks, Dr. William J. O’Reilly, Adolph Dumser, Jules O. Koenig, Charles T. Yenni, and Manuel Abascal, be, and are hereby, declared to be without authority to exercise the rights, duties, privileges, and franchises of members of the said board, and are hereby perpetually debarred from the same.
It is further ordered, adjudged, and decreed that the respondents pay the costs of both courts.
BREAUX, J., concurs in the decree.