# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-30920

United States Court of Appeals
Fifth Circuit

**FILED**

August 29, 2014

Lyle W. Cayce
Clerk

ANTHONY S. IOPPOLO, Medical Doctor,

Plaintiff-Appellant,

v.

CHRISTOPHER RUMANA, Medical Doctor; AMERICAN ASSOCIATION OF NEUROLOGICAL SURGEONS; MARK CUFFE, Medical Doctor; AMERICAN ASSOCIATION OF NEUROSURGEONS,

Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:06-CV-193

Before DAVIS, ELROD, and COSTA, Circuit Judges.*

PER CURIAM: **

Dr. Anthony Ioppolo appeals the district court's dismissal of his defamation and related claims against two fellow physicians and the American Association of Neurosurgeons, a private professional organization. We affirm the district court's judgment.

---

* Judge Costa participated by designation in the oral argument of this case as a United States District Judge for the Southern District of Texas. Since that time he has been appointed as a Fifth Circuit Judge.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-30920

I.

Plaintiff, Dr. Anthony Ioppolo ("Ioppolo"), a neurosurgeon in Baton Rouge, Louisiana, testified as an expert for the plaintiff in a Florida medical malpractice case in 2003. Drs. Mark Cuffe ("Cuffe") and Christopher Rumana ("Rumana") operated a neurological clinic in partnership with Dr. Eric Vogter, the principal defendant in the Florida case.[1] Following a settlement between the parties in the Florida proceedings, Drs. Rumana and Cuffe filed a complaint against Dr. Ioppolo with the American Association of Neurosurgeons (the "AANS"), alleging unprofessional conduct as it related to his expert testimony. Ioppolo, Rumana, and Cuffe are all members of the American Association of Neurological Surgeons ("AANS"), a private, voluntary association of neurosurgeons. The AANS encourages its members to testify as expert witnesses, as long as the testimony is in accordance with its Expert Witness Guidelines.

The Guidelines provide that the testimony be "truly expert, impartial and available to all litigants." Pursuant to the AANS bylaws, any active member in good standing "may prefer charges alleging that a Member is failing to maintain a good professional standing." Such a charge must be made in writing and state the basis of the charge. The written charge must be delivered to the Secretary of the Board of Directors, who is then required to forward a copy to the Professional Conduct Committee ("PCC"). Thereafter, the PCC "shall call on the members who bring the charges . . . to determine whether a hearing on the charges is warranted, and shall give the respondent an opportunity to respond in writing before such a decision is made." No action

---

[1] Dr. Vogter died during the pendency of the Florida litigation.

No. 13-30920

can be taken by the PCC against a member without giving that member an opportunity for a hearing. If the PCC determines that a hearing is necessary, the respondent member is entitled to conduct a self-defense or be represented by counsel. After the hearing, the PCC prepares its findings and recommendations in a written report submitted to the Board of Directors. Before the Board takes action on the PCC's report, the respondent member has an opportunity to comment on the report. If the outcome before the Board is unfavorable to the respondent member, he has an opportunity to appeal the Board's decision.

After the medical malpractice trial, Rumana and Cuffe preferred such a charge against Ioppolo by letter to the AANS criticizing his "ethics, honesty, integrity, and professionalism." The letter accused Ioppolo of giving "false and misleading testimony" during the trial in Florida. Upon receiving the letter, the AANS convened the PCC to investigate the allegations made by Rumana and Cuffe. A hearing was conducted in October 2004 where Ioppolo, Rumana, and Cuffe were all present. In December 2004, the PCC found that Ioppolo's conduct was "unprofessional" and "egregious," and recommended imposing sanctions against Ioppolo, subject to review by the Board of Directors of AANS at its annual meeting in April 2005. On April 15, 2005, the Board, after reviewing the PCC report and the CAT scan films of the patient in the Florida malpractice litigation, unanimously approved the two-year suspension recommended by the PCC.

On March 7, 2005, before the Board decision but after the PCC report was furnished to the parties, Rumana and Cuffe wrote to the Louisiana Board of Medical Examiners, seeking to file a formal charge of unprofessional conduct with that organization against Ioppolo. In addition, on April 15, 2005 (the day

3

No. 13-30920

of the Board's decision), Rumana and Cuffe distributed a copy of the PCC's preliminary findings to Louisiana Worker's Compensation Corporation ("LWCC") where Ioppolo served as medical director. Ioppolo also alleges that Rumana and Cuffe sent copies to Vista Surgical Hospital (where Ioppolo served as medical director), and the Neuromedical Center in Baton Rouge, Louisiana (Ioppolo's former workplace).

In February 2006, Ioppolo sued the AANS, Rumana, Cuffe, and the American College of Surgeons in state court. Ioppolo asserted claims of defamation, abuse of process, abuse of personal rights, and intentional infliction of emotional distress ("IIED"). Defendants removed the case on the basis of diversity jurisdiction under 28 U.S.C § 1332.

In March 2006, the AANS, Rumana, and Cuffe filed motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In April 2006, Ioppolo was granted a temporary restraining order to prevent the AANS from publishing the fact that it had suspended Ioppolo's membership in the organization while his case was pending in the district court. In July 2006, all parties agreed to a preliminary injunction.

Two years later, in July 2008, the district court heard arguments on the pending motions to dismiss, at which time it denied the motions filed by Rumana and Cuffe, and deferred ruling on the motion by the AANS. The court also instructed Ioppolo to amend his complaint against the AANS, or his claims against the AANS would be dismissed. In August 2008, Ioppolo filed a Second Amended Complaint against the AANS, alleging the same four causes of action. The AANS responded with a motion to dismiss the complaint.

In August 2011, the district court granted the AANS's motion to dismiss, finding that Ioppolo had failed to state a claim for defamation, abuse of process,

4

abuse of rights, or IIED. This left for resolution the claims against Drs. Rumana and Cuffe.

In July 2012, Rumana and Cuffe each filed a "renewed" motion to dismiss Ioppolo's claims against them pursuant to Rule 12(b)(6). The district court granted the motions with respect to Ioppolo's claims for abuse of rights, abuse of process, and IIED. The court also dismissed Ioppolo's defamation claim with respect to the initial publication of the PCC report because the claim was time barred under Louisiana's one-year prescriptive period.[2] The court declined to dismiss Ioppolo's defamation claim with respect to the subsequent publications by Rumana and Cuffe because they fell within the one-year prescriptive period.

Following the district court's ruling on the motions to dismiss, the only surviving claims were Ioppolo's claims for defamation with respect to Rumana and Cuffe's later publication of the PCC Report in March and April 2005. In January 2013, Cuffe filed a motion for summary judgment as to this claim. Rumana filed his own motion in March 2013. The district court granted both motions.

Ioppolo appeals from the district court's dismissal of each of his four claims.

## II.

We review a district court's dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure *de novo,*[3] construing all factual allegations in the light most favorable to the plaintiffs.[4] We accept as true all the facts pleaded in the

---

[2] The report was initially published in December 2004, and Ioppolo filed suit in February 2006.

[3] *Kopp v. Klein*, 722 F.3d 327, 333 (5th Cir. 2013) (citing *Atchafalaya Basinkeeper v. Chustz,* 682 F.3d 356, 357 (5th Cir. 2012)).

[4] *Id.* (citing *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999)).

No. 13-30920

complaint.[5] For a complaint to state a claim, the non-moving party must plead enough facts to state a claim to relief that is plausible on its face.[6]

"This court reviews a district court's grant of summary judgment *de novo,* applying the same standards as the district court." [7] "Summary judgment is warranted if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law."[8] "Without weighing the evidence, assessing its probative value, or resolving any factual disputes . . . we merely search the record for resolution-determinative factual disputes."[9] We must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations.[10]

### III.

### A.

We turn first to Ioppolo's claims for abuse of process and abuse of right. "Abuse of process involves the misuse of a process already legally issued whereby a party attempts to obtain a result not proper under the law."[11] To prevail on an abuse of process claim in Louisiana, a plaintiff must prove each of two elements: (1) the existence of an ulterior purpose; (2) a willful act in the

---

[5] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[6] *Chustz*, 682 F.3d at 358.

[7] *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 212 (5th Cir. 2013) (quoting *Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Houston,* 660 F.3d 235, 238 (5th Cir. 2011)).

[8] *Greater Hous. Taxicab*, 660 F.3d at 238 (alteration in original).

[9] *F.D.I.C. v. Myers*, 955 F.2d 348, 349 (5th Cir. 1992) (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887 (5th Cir. 1980)).

[10] *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).

[11] *Glotfelty v. Hart*, 2013-0870 (La. App. 1 Cir. 12/27/13); 2013 WL 6858285; *Goldstein v. Serio*, 496 So. 2d 412, 415 (La. Ct. App. 1986).

No. 13-30920

use of the process not proper in the regular prosecution of the proceeding.[12]

The district court concluded that the AANS proceedings did not constitute a "process" in this context under Louisiana law. We agree. Louisiana courts have never considered the "process" element of a cause of action for abuse of process "anything other than legal process, or court process."[13] Rather, under Louisiana law:

> [A]buse of process is the misuse of *legal process* for an ulterior purpose. It consists in the malicious misuse or misapplication of that process after issuance to accomplish some purpose not warranted or commanded by the writ. It is malicious perversion of a *legally issued process* whereby a result not lawfully or properly obtainable under it is attempted to be secured.[14]

There is no evidence to suggest that the AANS proceedings are anything other than the mechanism of a private professional organization to enforce its ethical and professional standards. Therefore, Ioppolo has failed to state a claim for abuse of process under Louisiana law because he has not alleged the use of any qualifying "process."

The abuse of rights doctrine is a civil law concept which is rarely used in Louisiana,[15] and applies only when one of the following conditions are met: (1) the predominant motive for exercise of the right is to cause harm; (2) there is no serious or legitimate motive for exercise of the right; (3) the exercise of the

---

[12] *Nathans v. Vuci*, 443 So. 2d 690, 694–95 (La. Ct. App. 1983) (citing *Succession of Cutrer v. Curtis*, 341 So. 2d 1209, 1213–14 (La. Ct. App. 1976), *writ denied,* 343 So. 2d 201 (La. 1977)). ("[T]he mere issuance of process is not actionable as an abuse of process; there must be use of the process, and that use must of itself be without the scope of the process, and hence improper...." (citation omitted)).

[13] *Almerico v. Dale*, 05-749 (La. App. 5 Cir. 3/28/06); 927 So. 2d 586, 594.

[14] *Id.* (quoting *Succession of Cutrer*, 341 So. 2d at 1214) (emphasis added). *See also Mini-Togs, Inc. v. Young*, 354 So. 2d 1389, 1390 (La. Ct. App. 1978) ("A legal and legitimate use of process, to effect the result which such process is *designed by law* to accomplish, is not an abuse thereof." (citation omitted) (emphasis added)).

[15] *See Steier v. Heller*, 31-733 (La. App. 2 Cir. 5/5/99); 732 So. 2d 787, 790–91.

No. 13-30920

right violates moral rules, good faith, or elementary fairness; or (4) the exercise of the right is for a purpose other than that for which it was granted.[16] The district court dismissed Ioppolo's abuse of rights claim for failure to state a claim. The court determined Ioppolo failed to allege facts which would support a cause of action for any of the four conditions above.

Ioppolo contends that the AANS, Rumana, and Cuffe abused their rights under the AANS bylaws by pursuing the complaint against him as a result of his expert testimony. However, he fails to adequately brief this argument on appeal.[17]  For this reason, Ioppolo has waived any argument with respect to his claim for abuse of rights, and we affirm the district court's dismissal for the reasons stated by the district court.

B.

Next, we address Ioppolo's claim for Intentional Infliction of Emotional Distress ("IIED"). Under Louisiana law, a plaintiff claiming IIED must establish three elements: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress

---

[16] *Id.* at 791. (citing *Mass. Mut. Life Ins. Co. v. Nails*, 549 So. 2d 826 (La. 1989)).

[17] Our opinion in *United States v. Scroggins* provides a helpful and accurate summation of our law on this issue:

> A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it.  It is not enough to merely mention or allude to a legal theory.  We have often stated that a party must "press" its claims.  At the very least, this means clearly identifying a theory as a proposed basis for deciding the case—merely "intimating" an argument is not the same as "pressing" it.  In addition, among other requirements to properly raise an argument, a party must ordinarily identify the relevant legal standards and any relevant Fifth Circuit Cases.  We look to an appellant's initial brief to determine the adequately asserted bases for relief.

599 F.3d 433, 446–47 (5th Cir. 2010) (citations and quotations omitted). Ioppolo mentions this claim only twice early in his brief. He fails to address it substantively, or refer to it at all, in his argument that the district court's 12(b)(6) ruling was in error.

No. 13-30920

or knew that severe emotional distress would be certain or substantially certain to result from his conduct.[18] "It is not enough that the defendant has acted with intent which is tortuous, or that he maliciously intended to inflict emotional distress."[19] "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."[20]

The district court dismissed Ioppolo's IIED claim as to each defendant, finding that his allegations did not rise to the "high level of 'extreme and outrageous' conduct" to constitute IIED under Louisiana law.

Ioppolo contends that the allegations in his Second Amended Complaint meet the pleading requirements because he "precisely pled" each of the elements of IIED in his petitions and complaints against each defendant, sometimes using the exact language of the required elements. This contention is incorrect. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ."[21] Therefore, we must examine whether the alleged actions of the defendants are "extreme and outrageous" so as to state a claim for IIED under Louisiana law.

Rumana and Cuffe filed a complaint with the AANS, which was their right as members of the organization. Ioppolo complains, however, that

---

[18] *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).

[19] *James v. Woods*, No. 14-216, 2014 WL 1896760, *4 (E.D. La. May 12, 2014) (citing *Nicholas v. Allstate Ins. Co.*, 765 So. 2d 1017, 1022 (La. 2000)).

[20] *White*, 585 So. 2d at 1209.

[21] *Twombly*, 550 U.S. at 555 (citation omitted).

No. 13-30920

Rumana and Cuffe participated in the proceedings before the PCC by giving false and misleading testimony to the committee. Ioppolo further alleges that Rumana and Cuffe then distributed the report of the PCC to Ioppolo's employers, colleagues, and the Louisiana State Board of Medical Examiners, prior to review by the Board of Directors of the AANS. Lastly, Ioppolo alleges that the AANS refused to police the abuses of its members, Rumana and Cuffe, and therefore became complicit in their conduct, and refused to communicate with the entities and individuals who received the PCC report prematurely sent out by Rumana and Cuffe.

The defendants' actions did not rise to the level of "extreme" or "outrageous," and the district court did not err in dismissing Ioppolo's IIED claim. The AANS, Rumana, and Cuffe merely followed a procedure established by the AANS for its members to report on potentially unprofessional conduct of a fellow member of the organization. The alleged violation of that procedure is Rumana and Cuffe's distribution of the PCC Report prior to the decision of the Board of Directors. This conduct, even if it were tortuous, is not sufficient to state a claim for IIED.[22] Liability for IIED requires much more than tortuous conduct—it requires conduct that goes "beyond all possible bounds of decency" which can be "regarded as atrocious and utterly intolerable in a civilized community."[23] The alleged conduct of defendants does not rise to this level. Therefore, we affirm the district court's dismissal of Ioppolo's IIED claim.

C.

Finally, we turn our attention to Ioppolo's claim for defamation. "Defamation is a tort which involves the invasion of a person's interest in his

---

[22] *See James*, 2014 WL 1896760, at *4 (citing *Nicholas,* 765 So. 2d at 1022).
[23] *White*, 585 So. 2d at 1209.

10

or her reputation and good name."[24] In order to state a cause of action for defamation, a plaintiff must establish four elements: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury."[25] Because this is a case against a private individual, the fault required to establish liability is negligence.[26]

"Defamatory words are, by definition, words which tend to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person, or otherwise expose a person to contempt or ridicule."[27] Under Louisiana law, there are two categories of defamatory words: words that are defamatory *per se*, and words that are susceptible of defamatory meaning.[28] "Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se."[29] When a plaintiff proves publication of words that are defamatory *per se*, the elements of falsity and fault are presumed, and the burden shifts to the defendant to rebut this presumption.[30] Injury may also

---

[24] *Cyprien v. Bd. of Sup'rs ex rel. Univ. of La. Sys.*, 08-1067 (La. 1/21/09); 5 So. 3d 862, 866 (quoting *Costello v. Hardy*, 03-1146 (La. 1/21/04); 864 So. 2d 129, 139).

[25] *Id.*

[26] *Kennedy v. Sheriff of E. Baton Rouge*, 05-1418 (La. 7/10/06); 935 So. 2d 669, 679. (". . . [W]e decline the invitation to adopt a *New York Times* standard of liability in cases involving private individuals and matters of public concern, and instead adopt the negligence standard set forth in the RESTATEMENT (SECOND) OF TORTS § 580B.")

[27] *Costello*, 864 So. 2d at 140 (citations omitted).

[28] *Id.* at 674–75 (citation omitted).

[29] *Id.* at 675 (citations omitted).

[30] *Id.* (citation omitted).

be presumed.[31] On the other hand, when the words are not defamatory per se, a plaintiff must prove all elements of his claim.[32]

The district court adjudicated Ioppolo's defamation claims in three separate rulings. In August 2011, the court dismissed Ioppolo's defamation claim against the AANS for lack of publication because Ioppolo's complaint only alleges that the AANS published the report to its membership, not to third parties. Ioppolo fails to respond to the district court's ruling in his principal brief, but contends in his reply brief that the AANS is responsible for the subsequent publication of the PCC report by Rumana and Cuffe because it "is a juridical entity and is only capable of acting through its members." After careful review, we agree with the district court's conclusion. The AANS followed its own internal protocol when it distributed the PCC Report to its membership. Pursuant to AANS procedure, the PCC Report was required to be distributed to the membership once Ioppolo appealed the decision to the Board of Directors. This distribution exclusively within the organization, and pursuant to the organization's rules, is comparable to an intra-corporate communication among employees within the course and scope of their employment. Under Louisiana law, such statements are not "publicized" to third persons so as to constitute publication in a defamation claim.[33]

The Louisiana case of *Doe v. Grant* illustrates this point.[34] In that case, the plaintiff, also a physician, performed an angioplasty procedure on a patient who died. [35] An Ad Hoc Committee of plaintiff's peers reviewed the case and

---

[31] *Id.* (citation omitted).

[32] *Id.* (citation omitted).

[33] *See, e.g., Bell v. Rogers*, 29-757 (La. App. 2 Cir. 8/20/97); 698 So. 2d 759.

[34] *See* 01-0175 (La. App. 4 Cir. 1/29/03); 839 So. 2d 408.

[35] *Id.* at 412.

submitted its findings to a Medical Executive Committee ("MEC").[36] The MEC concluded that plaintiff's performance was below the standard of care and unprofessional, and summarily suspended plaintiff from practicing medicine in the hospital.[37] The Board of Trustees of the hospital upheld the MEC's decision to suspend the plaintiff.[38] In response, the plaintiff brought defamation claims against his employer, the hospital, as well as his co-employees.[39] In his complaint, plaintiff pointed to three incidents which he claimed constituted "publication" of the allegedly defamatory statements contained in the report: a) a doctor sharing the contents of the report with hospital staff; b) hospital administration telling nursing staff and others that plaintiff's privileges had been suspended; and c) a fellow doctor informing the Board of Trustees that the MEC had reaffirmed its decision to summarily suspend the plaintiff.[40] The court in *Grant* reasoned that these incidents did not amount to publication because they were necessary to ensure the safety of the patients at the hospital, and to inform other doctors and nurses that plaintiff's privileges had been suspended. Thus, the court concluded that these communications were protected.[41]

The PCC Report in the instant case is comparable to the communications in *Grant.* Both involved the findings of professional committee hearings and the suspension of privileges. Both contained statements which were damaging to a physician's professional reputation. In each case, the communications were distributed only to the parties as provided in the organization's rules, and were

---

[36] *Id.* at 412–13.

[37] *Id.* at 413.

[38] *Id.*

[39] *Id.*

[40] *Id.* at 416.

[41] *Id.*

necessary to ensure effective operation of the organization. We agree with the district court's conclusion that Ioppolo failed to allege the required publication by the AANS, and his defamation claim against the AANS was properly dismissed.

We now turn to Ioppolo's defamation claim against Rumana and Cuffe. The district court dismissed as time barred that part of Ioppolo's defamation claim against Rumana and Cuffe related to the first distribution of the PCC Report. The PCC Report was initially distributed on December 28, 2004, and Ioppolo filed suit more than one year later, on February 9, 2006. Ioppolo's claims based on this distribution are therefore time barred on their face under Louisiana's one-year statutory limit.[42] However, this does not absolve Rumana and Cuffe from liability for defamation. As discussed in detail below, Rumana and Cuffe later republished the PCC Report to third parties in March and April 2005, less than one year before Ioppolo filed suit. Under Louisiana law, "each and every publication or communication to a third person constitutes a separate cause of action."[43] Therefore, Ioppolo maintains a timely cause of action for defamation against Rumana and Cuffe based on their subsequent distribution of the letter and the PCC Report.

In its third and final ruling addressing the defamation claims, the district court, on summary judgment, dismissed Ioppolo's claims against Rumana and Cuffe based on their distribution of the PCC Report to the Louisiana State Board of Medical Examiners ("LSBME") and the LWCC.

Ioppolo argues that this distribution constitutes defamation. According

---

[42] *See Lyons v. Knight*, 10-1470 (La. App. 3 Cir. 5/11/11); 65 So. 3d 257, 260 (citing LA. CIV. CODE ANN. art. 3492).

[43] *Reed v. Baton Rouge Crime Stoppers*, 11-0618, *2 (La. App. 1 Cir. 11/9/11); 2011 WL 5419678.

to Ioppolo, the following statements by Rumana and Cuffe in their letter were defamatory: (1) that Ioppolo gave "false testimony which was not supported by any medical literature in this case"; (2) that Ioppolo was "a biased expert, not an impartial one"; (3) that Ioppolo's testimony that there was an extradural clot compressing the spinal cord was incorrect, highly damaging, and substandard for a neurological surgeon; (4) that the verdict in the Florida case "threatened to bankrupt the Tallahassee Neurological Center . . ."; (5) that Ioppolo offered an overoptimistic prognostication which was "misleading to the jury"; (6) that Ioppolo's trial testimony was "scientifically baseless and irresponsible advocacy"; and (7) that the PCC considers Ioppolo's conduct unprofessional and egregious. Additionally, Ioppolo contends that several statements contained within the PCC report were also defamatory upon publication to third parties. Ioppolo also argues that the statements by Rumana and Cuffe are defamatory per se because they bear negatively on his "professionalism, knowledge as a physician, propensity for truthfulness, morality, and responsibility as an expert."

We affirm the district court's dismissal for the following reasons. First, the PCC Report itself is a statement of opinion, not fact. The First Amendment provides "a defense against defamation actions for expressions of opinion about matters of public concern made without knowing or reckless falsity."[44] The PCC Report was rendered after the committee heard evidence, resolved conflicts, made credibility calls, and reached a decision similar to an opinion issued by a court. (The PCC decision was affirmed by the Board of Directors on appeal.) The Report is littered with phrases and statements which clearly

---

[44] *Mashburn v. Collin*, 355 So. 2d 879, 885 (La. 1977). *See also Bussie v. Lowenthal*, 535 So. 2d 378 (La. 1988).

indicate it is a statement of opinion.[45] Moreover, the veracity and reliability of expert medical testimony given during trial is a matter of public concern because it is a critical part of the efficient administration of justice.[46] Second, the letter distributed by Rumana and Cuffe to the LSBME and LWCC which accompanied the PCC Report is almost entirely a summary of the PCC Report, and often repeats or paraphrases language in the Report. Specifically, the statements above numbered 2, 3, 5, 6, are essentially identical to conclusions reached in the PCC Report. Statements 1 and 7 are generalizations of the PCC's findings in its report.[47] The statement that Ioppolo's testimony was false, incorrect, and misleading based on his interpretation of the CT scan is an opinion based on a physician's expertise as a neurosurgeon. Use of the word "false" in the statement does not change its nature, and is not substantively different than stating that Ioppolo's testimony was "incorrect," "baseless," or "misleading." This is true even though Drs. Rumana and Cuffe express their

---

[45] *See Bussie*, 535 So. 2d at 381–83. These phrases include: "The PCC concludes that [Ioppolo] demonstrated a lack of adequate subject matter knowledge . . ."; "we consider Dr. Ioppolo's trial testimony that there had been 'little or no irreversible damage . . . to be scientifically baseless and irresponsible advocacy'"; and "we . . . consider Dr. Ioppolo's unequivocal testimony that there was an extradural clot compressing the cord to be incorrect, highly damaging, and substandard for a neurological surgeon."

[46] *See, e.g., Baton Rouge Waterworks Co. v. Louisiana Pub. Serv. Comm'n*, 156 La. 539, 548–49 (La. 1924) ("'The administration of justice, the preservation of the public peace, and the like . . . are essentially matters of public concern." (quoting *State ex rel. Saunders v. Kohnke*, 109 La. 838, 846 (La. 1903)).

[47] The PCC Report concluded that "Dr. Ioppolo demonstrated a lack of adequate subject matter knowledge and acted as an advocate for the plaintiff and the plaintiff attorney rather than as an unbiased witness."

Rumana and Cuffe's letter also stated that Ioppolo "was not qualified to even give testimony in [the Florida malpractice] case by the standards of the American College of Surgeons." The American College of Surgeons guidelines for testimony require that an expert be a practicing surgeon who currently practices in the area relevant to his testimony. Ioppolo fails to mention this statement in his briefs. After reviewing the record and the ACS guidelines, we cannot say this statement is untrue, and therefore it is not defamatory.

views that Ioppolo's interpretation is unquestionably and flagrantly off-base. This is still an opinion.

Even if we assume *arguendo* that the PCC Report and the letter by Rumana and Cuffe do not constitute opinion, they are still immune from a claim for defamation if the statements are subject to a qualified privilege. "In Louisiana, privilege is a defense to a defamation action."[48] "The doctrine of privilege rests upon the notion that sometimes, as a matter of public policy, in order to encourage the free communication of views in certain defined instances, one is justified in communicating defamatory information to others without incurring liability."[49] "The elements of a conditional privilege have been described as good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner to the proper parties only."[50] "The practical effect of the assertion of the conditional or qualified privilege is to rebut the plaintiff's allegation of fault and to place the burden of proof on the plaintiff to establish abuse of the privilege."[51]

Determining whether a qualified privilege exists involves a two-step process. "First, it must be determined whether the attending circumstances of a communication occasion a qualified privilege."[52] Second, we determine

---

[48] *Kennedy*, 935 So. 2d at 681 (citing *Costello*, 864 So. 2d at 141).

[49] *Kennedy*, 935 So. 2d at 681 (citing *Toomer v. Breaux*, 146 So. 2d 723, 725 (La. App. 1962)).

[50] *Hakim v. O'Donnell*, 49,140, *6 (La. App. 2 Cir. 6/25/14); --- So. 3d --- (citing *Kennedy*, 935 So. 2d 669; *Martin v. State, Dep't of Pub. Safety & Corr., Office of State Police*, 47,647 (La. App. 2 Cir. 1/16/13); 109 So. 3d 442).

[51] *Dyas v. Shreveport Police Dep't*, 48,804, *11 (La. App. 2 Cir 2/26/14); 126 So. 3d 897, 904 (citing *Kennedy*, 935 So. 2d 669).

[52] *Kennedy*, 935 So. 2d at 682 (citing *Smith v. Our Lady of the Lake Hospital, Inc.*, 93-2512 (La. 7/5/94), 630 So. 2d 730).

"whether the privilege was abused, which requires that the grounds for abuse—malice or lack of good faith—be examined."[53] "While the first step is generally determined by the court as a matter of law, the second step of determining abuse of a conditional privilege or malice is generally a fact question for the jury '[u]nless only one conclusion can be drawn from the evidence.'"[54]

A Louisiana court has applied the qualified privilege in "attending circumstances" similar to this case. In *Elmer v. Coplin*, the defendant, an attorney, wrote a letter to the National Conference of Bar Examiners which accused the plaintiff, an applicant to the District of Columbia Bar, of participating in the fraudulent misrepresentation of the assets and liabilities of a company the plaintiff represented.[55] Despite finding that defendant's letter was defamatory *per se* after a bench trial, the court upheld the dismissal of plaintiff's defamation claim because defendant was protected by the qualified privilege.[56] The *Elmer* court found the privilege applied even though the defendant's statements in that case were ultimately found in a separate proceeding to be false.[57]

In addition, Louisiana courts have held that a qualified privilege is generally necessary for statements made when reviewing the fitness of medical doctors to practice their profession.[58] Although the instant case does not

---

[53] *Id.*

[54] *Id.* at 682.

[55] 485 So. 2d 171, 174 (La. Ct. App. 1986).

[56] *Id.* at 178–80.

[57] *Id.* at 178.

[58] *Smith*, 639 So. 2d at 744 ("'…If a conditional privilege should *ever* operate, indeed if there is one instance where society should encourage uninhibited communication, it is in the review of the competency of medical professionals.'") (quoting *Sibley v. Lutheran Hosp. of Maryland,*

directly concern Dr. Ioppolo's fitness to practice medicine, it does involve his ability to provide competent expert medical testimony based upon his qualifications as a neurosurgeon. The competency of such testimony implicates his ability to practice, and also affects the public's interest in the proper administration of the judicial system. Thus, the circumstances of this case warrant application of the qualified privilege.

Moving to the second part of the test, we find no sign of abuse of the qualified privilege by Rumana and Cuffe. Ioppolo produced no summary judgment evidence tending to show that Rumana and Cuffe knew their statements were false, or acted with reckless disregard as to their truth, when they wrote their letter and distributed it to the LSBME and LWCC. Ioppolo asserts that Rumana and Cuffe's initial complaint to the AANS and their testimony during the hearing before the PCC were "misleading, speculative, false and prejudicial in nature." Therefore, according to Ioppolo, Rumana and Cuffe's letter which accompanied the PCC Report was defamatory and constituted an abuse of the qualified privilege because it was based upon these prior false statements.

"The conditional privilege is abused, and thus inapposite, when the 'defendant steps outside the scope of the privilege, or abuses the occasion.'"[59] The defendant abuses the privilege when he acts with knowledge of falsity, or reckless disregard for the truth.[60] The initial complaint and testimony are not

---

*Inc.*, 871 F.2d 479, 483 (4th Cir. 1989)). *See also Sanders v. State ex rel. Dep't of Health and Hosp.*, 2011-0814, *11–12 (La. App. 1 Cir. 8/2/12); 2012 WL 3133694.

[59] *Smith*, 639 So. 2d 730, 744 (citing W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER & KEETON ON TORTS § 115, P. 832 (5th Ed. 1984)).

[60] *Kennedy*, 935 So. 2d at 686.

shown to be knowingly false. In fact, these statements were subsequently corroborated by the PCC Report after an extensive investigation. Moreover, Ioppolo's allegation that the PCC Report, and the letter which accompanied it, were based on the prior false statements of Rumana and Cuffe, fails to tell the whole story. The PCC issued its report following an adversarial hearing during which *both* sides testified and presented evidence; it was not an *ex parte* proceeding. That the PCC decided in favor of Rumana and Cuffe supports the notion that they had a reasonable basis for their allegations. The record does not show that Rumana and Cuffe's letter "is fabricated . . . , the product of [their] imagination, or is so inherently improbable that only a reckless man would have put it in circulation."[61]   Ioppolo has failed to show that Rumana and Cuffe either knew their statements were false or acted with reckless disregard for their truth. Thus, even assuming *arguendo* that the statements made by Rumana and Cuffe in their letter are not statements of opinion, the summary judgment record supports their argument that they were entitled to a qualified privilege.

## IV.

For the reasons stated above, we affirm the district court's dismissal of Dr. Ioppolo's action against the AANS, and Drs. Rumana and Cuffe.

AFFIRMED.

---

[61] *Id.* at 689 (citing *Trentecosta v. Beck*, 96-2388, \*15 (La. 10/21/97); 703 So. 2d 552, 561).

JENNIFER WALKER ELROD, Circuit Judge, concurring in part and dissenting in part:

I agree with the panel opinion that the district court properly dismissed Dr. Ioppolo's claims for abuse of process, abuse of right, and intentional infliction of emotional distress, as well as his defamation claim against the American Association of Neurosurgeons ("AANS"). I write separately because, in my view, Drs. Rumana and Cuffe were not entitled to summary judgment on Dr. Ioppolo's defamation claims against them.

This case arises out of the expert testimony that Dr. Ioppolo offered against Dr. Vogter—a former business partner of Drs. Rumana and Cuffe—in a medical malpractice case. Dr. Ioppolo offered testimony suggesting that Dr. Vogter did not follow proper hospital policy in a case where a ten-year-old boy ultimately became quadriplegic. Specifically, Dr. Ioppolo testified that he reviewed CT films which showed hematoma on the boy's CT scan. Dr. Iopppolo further testified that the hematoma compressed the boy's spinal cord, and that standard hospital policy suggested that Dr. Vogter should have given the boy steroids and performed a decompressive surgery on the hematoma.

Drs. Ioppolo, Rumana, and Cuffe were all members of the professional association AANS. After the malpractice case settled, Drs. Rumana and Cuffe filed a complaint against Dr. Ioppolo with the AANS's Professional Conduct Committee ("PCC") regarding his testimony against Dr. Vogter. In their complaint, they alleged that Dr. Ioppolo's testimony was "false, inaccurate and constituted a violation of the AANS Expert Witness Rules." Both Drs. Rumana and Cuffe subsequently participated in the PCC's proceedings against Dr. Ioppolo. According to Dr. Ioppolo, Drs. Rumana and Cuffe's testimony included "prejudicial and unsubstantiated allegations about the factual

background" of the malpractice case.   For example, the physicians testified that no doctor could have seen a hematoma compressing the boy's spinal cord on a CT scan.   Dr. Ioppolo asserts that these statements were later incorporated into the PCC's resulting report.   The PCC report found that Dr. Ioppolo "demonstrated a lack of adequate subject matter knowledge [in the malpractice case] and acted as an advocate for the plaintiff's attorney rather than as an unbiased witness."   The AANS Board reviewed the PCC report, and unanimously approved a two-year suspension for Dr. Ioppolo.

Before Dr. Ioppolo had a chance to make use of the appeals process available within the AANS for such reports, Drs. Rumana and Cuffe mailed copies of the PCC report to the Louisiana State Board of Medical Examiners ("LSMB") and the Louisiana Workers' Compensation Corporation ("LWCC"). These reports were accompanied by letters from Drs. Rumana and Cuffe purporting to summarize the PCC report and including a number of negative statements about Dr. Ioppolo.   For example, one letter stated that "Dr. Ioppolo gave false, misleading expert testimony;" that he "was a biased expert, not an impartial one;" and that his testimony was "scientifically baseless and irresponsible advocacy."   Dr. Ioppolo then filed suit against the AANS and Drs. Rumana and Cuffe alleging, among other things, that the statements in the report and letters were defamatory.[1]

The panel opinion holds that the PCC report and the accompanying letters sent by Drs. Rumana and Cuffe were statements of opinion, and that

---

[1] Attacks, such as these, on an expert witness's professional standing can also negatively impact the ability of plaintiffs to bring medical malpractice cases by making physicians less willing to testify against other members of their profession.   *See, e.g.*, James A. Lowe & Mark L. Wakefield, Am. L. Prod. Liab. 3d § 68:33 (noting that finding an expert witness in a medical malpractice case is "usually a hair-pulling experience").

even if they were not, the statements would still be immune from a defamation claim because they are subject to a qualified privilege.   I respectfully disagree.

"The distinction drawn between opinion and statement of fact has long been important at common law because most states restricted the privilege of fair comment to expressions of opinion."   *Mashburn v. Collin*, 355 So. 2d 879, 885 (La. 1977) (citation omitted).

> Although difficult to state in abstract terms, as a practical matter, the crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact.

*Id.* (citation omitted).

I agree with the panel opinion that the PCC report contains a number of opinions, and that such opinions are protected from defamation claims by the First Amendment.   *See id.* (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 283 (1964)).   However, not all of the statements that Dr. Ioppolo complains of can be fairly characterized as opinions.   For example, Drs. Rumana and Cuffe's letter to the LSMB stated that "Dr. Ioppolo gave false testimony which was not supported by any medical literature in this case."   An ordinary person reading this statement would likely understand this to be a statement of fact: Either Dr. Ioppolo did, or did not, give false testimony.   Only a fact can be true or false.   Indeed, as Dr. Cuffe himself notes, two of the synonyms for "false" are "contrary to fact" and "counterfactual."   Thus, the statement that Dr. Ioppolo gave false testimony is best characterized as a statement of fact, rather than an opinion.

Because not all of Drs. Rumana and Cuffe's statements were protected opinions, I next turn to whether their statements were covered by qualified

privilege. "[T]he analysis for determining whether a conditional privilege exists involves a two-step process."[2] *Kennedy*, 935 So. 2d at 682. "First, it must be determined whether the attending circumstances of a communication occasion a qualified privilege." *Id.* "Attending circumstances" include the "communication of alleged wrongful acts to the officials authorized to protect the public" such as when a member of the public alerts the police of potentially dangerous or criminal activity. *Id.* Louisiana has also recognized a qualified privilege for "communications between an employer and the Department of Employment Security" regarding the reasons for an employee's termination. *Watson v. Willis–Knighton Med. Ctr.,* 93 So. 3d 855, 860 (La. App. 2 Cir. 2012) (citing *Kosmitis v. Bailey*, 685 So.2d 1177 (La. App. 2d Cir. 1996)).

"The second step of the analysis is a determination of whether the privilege was abused, which requires that the grounds for abuse—malice or

---

[2] The district court incorrectly applied an earlier standard for qualified privilege based on our decision in *Rouly v. Enserch Corp.*, 835 F.2d 1127, 1130 (5th Cir. 1988). Since that decision, however, the Louisiana Supreme Court has adopted a new test, which we must apply. *See Vandenbark v. Owens–Ill. Glass Co.,* 311 U.S. 538 (1941); Charles Alan Wright & Mary Kay Kane, 20 Fed. Prac. & Proc. Deskbook § 61 ("[U]nder the *Erie* rule it is never too late to change in conformity to some new pronouncement of state law, and a court of appeals must rely on the latest state decisions even though they come after the federal court decision that the appellate court is reviewing."). As the Louisiana Supreme Court explained:

> Early appellate court decisions in Louisiana characterized the conditional or qualified privilege as applying if the communication is made (a) in good faith, (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty, (c) to a person having a corresponding interest or duty. Under this formulation, which finds its genesis in *Madison*'s citation of a passage from an encyclopedia, courts typically focused on the requirements of good faith and proper publication to determine in the first instance if the privilege applied.

> In *Smith v. Our Lady of the Lake Hospital, Inc.*, [639 So.2d 730 (La. 1994)], we eschewed that approach [in favor of the two-step analysis].

*Kennedy v. Sheriff of E. Baton Rouge,* 935 So. 2d 669, 682 (La. 2006).

lack of good faith—be examined." *Id.* "While the first step is generally determined by the court as a matter of law, the second step of determining abuse of a conditional privilege or malice is generally a fact question for the jury [u]nless only one conclusion can be drawn from the evidence." *Id.* (internal quotation marks and citations omitted); *see also* William Lloyd Prosser & W. Page Keeton, Prosser & Keeton On Torts § 115 at 835 (5th ed. 1984).

Even assuming *arguendo* that Drs. Rumana and Cuffe met the first step in the qualified privilege test, the district court should not have granted summary judgment because a fact issue remains as to whether Drs. Rumana and Cuffe abused the privilege by acting with actual malice. The practical effect of asserting a conditional or qualified privilege is to rebut the plaintiff's allegations of malice and to place the burden of proof on the plaintiff to establish an abuse of the privilege.[3] *Kennedy*, 935 So. 2d at 683. Establishing an abuse of privilege requires the plaintiff to prove that the defendants acted with actual malice—that is, with knowing falsity, or reckless disregard for the truth. *Id.* at 685.

Dr. Rumana argues that he and Dr. Cuffe "had every reason to believe the PCC report was 'true'" because it was the result of the PCC's evidentiary proceeding against Dr. Ioppolo. But as Dr. Ioppolo notes, the PCC report was based in part on Drs. Rumana and Cuffe's own testimony. If, as Dr. Ioppolo asserts, Drs. Rumana and Cuffe knew that their testimony and allegations

---

[3] Dr. Ioppolo has alleged defamation *per se*, which would ordinarily shift the burden to Drs. Rumana and Cuffe to prove good faith or a lack of malice. *See Kennedy*, 935 So. 2d at 675 ("When words are defamatory per se, malice as well as injury are presumed, but may be rebutted by the defendant."). However, because Drs. Rumana and Cuffe asserted a qualified privilege, the burden once again shifted back to Dr. Ioppolo to show malice. *Id.* at 683. In order to survive summary judgment, he had to put forth evidence showing an issue of material fact on this issue.

were untrue, then they certainly had reasons to doubt the veracity of the resulting PCC report.   In *Kennedy*, the Louisiana Supreme Court explained that summary judgment was appropriate because "there is no allegation and certainly no evidence to support a contention" that the defendants knew their statements were false.   *Id.* at 687–88; *see also id.* at 688 ("In fact, Kennedy's petition alleges only negligence on the part of [the defendants]."). By contrast, the very heart of Dr. Ioppolo's case is his contention that Drs. Rumana and Cuffe gave the PCC false information in order to harm him.

The summary judgment record included Dr. Ioppolo's affidavit, which states:

> At the [PCC] meeting, [Drs.] Rumana and Cuffe submitted an extensive presentation which was misleading, speculative, false and prejudicial in nature, and which included hearsay, matters not in the medical records and representations which were simply untrue.
> . . .
>
> Apparently emboldened by the preliminary report and in complete disregard for the by-laws of the AANS to the appeal, [Drs.] Rumana and Cuffe commenced a systematic disbursement of the report of the PCC to my employers, colleagues and others, sending facsimiles to these entities, attaching copies of the opinion which was based upon their falsehoods and misrepresentations.
> . . .
>
> They included a copy of the report, though they knew that those findings were disputed, that they were not final and that they were not allowed [to] be made public.

The record also included the transcript of Drs. Rumana and Cuffe's testimony before the PCC.   Dr. Ioppolo identified a number of statements that the two doctors made, which Dr. Ioppolo claims were unsupported by any evidence.   A reasonable jury could find that that making such unsupported

No. 13-30920

statements, and then distributing a report based on those statements, demonstrated a reckless disregard for the truth.[4]   Dr. Ioppolo also submitted an affidavit from the President and CEO of the LWCC, Kristin Wall, stating:

> I found it especially interesting that the complaints against Dr. Ioppolo were made by the defendant doctors in that case after they had settled their case and after he had been qualified to testify by the court and subjected to cross-examination by the remaining defendants.

Viewed in the light most favorable to Dr. Ioppolo, these statements create a fact issue as to whether Drs. Rumana and Cuffe abused their qualified privilege.   In addition to these affidavits, Dr. Ioppolo's position could also be supported by the fact that Drs. Rumana and Cuffe chose to send out the PCC report before Dr. Ioppolo had a chance to exhaust the AANS appeals process and challenge the report's findings.   This refusal to wait and ensure that any errors in the report were corrected could serve as evidence that they showed a reckless disregard for the truth.   Because more than "one conclusion can be drawn from the evidence," the district court should not have granted summary judgment on Dr. Ioppolo's defamation claim against Drs. Rumana and Cuffe. *Kennedy*, 935 So. 2d at 682.

---

[4] Dr. Ioppolo's own affidavit alone would be sufficient to survive summary judgment. *See C.R. Pittman Constr. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) ("[A]n affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue, even if the affidavit is arguably self-serving."); *see also Rushing v. Kan. City S. Ry.*, 185 F.3d 496, 513 (5th Cir.1999) ("[M]erely claiming that the evidence is self-serving does not mean we cannot consider it or that it is insufficient.   Much evidence is self-serving and, to an extent, conclusional."), *superseded on other grounds* by Fed. R. Evid. 103(a).